IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

IN RE:                                                In Proceedings Under
                                                      Chapter 11
CORT JONES
LISA JONES,                                           Case No. 10-41897

      Debtors.


PEOPLES NATIONAL BANK, N.A.,

      Plaintiff

      v.                                              Adv. No. 11-4050

CORT JONES, LISA JONES, and
BANTERRA BANK,

      Defendants

OPINION

      Plaintiff Peoples National Bank filed a complaint seeking to determine the priority of liens on a parcel of real property.  This matter is before the Court on cross-motions for summary judgment on that complaint  by both the plaintiff and defendant Banterra Bank.

FACTS

      Pursuant to the parties' stipulation and documents submitted, the following facts are not in dispute:

      In 2001, debtors Cort and Lisa Jones acquired title to ten acres of real estate located in Mount Vernon, Illinois.  This parcel was subsequently subdivided  into a residential subdivision known as Windsor Place.

      On November 1, 2004, debtors obtained a loan from Peoples National Bank (Peoples) in

-1-

the original principal amount of $214,044.26, evidenced by Promissory Note #18452 (Peoples'

Loan 1).  Peoples' Loan 1 was secured by a real estate mortgage dated November 1, 2004 and

recorded November 5, 2004.  The mortgage covered Lots 1-11, 13, and 15-19 of the Windsor

Place subdivision. It contained a maximum lien clause which specifically provided that at no

time should the principal amount of the indebtedness secured by the mortgage exceed

$214,044.26 (Joint Stipulation, Exhibit #3).  In addition, said mortgage included a cross-

collateralization clause which provided as follows:

> **CROSS-COLLATERALIZATION.**  In addition to the Note, this Mortgage
> secures all obligations, debts and liabilities, plus interest thereon, of Grantor to
> Lender, or any one or more of them, as well as all claims by Lender against
> Grantor or any one or more of them, whether now existing or hereafter arising,
> whether related or unrelated to the purpose of the Note, whether voluntary or
> otherwise, whether due or not due, direct or indirect, determined or undetermined,
> absolute or contingent, liquidated or unliquidated whether Grantor may be liable
> or jointly with others, whether obligated as guarantor, surety, accommodation
> party or otherwise and whether recovery upon such amounts may be or hereafter
> may become barred by any statute of limitations and whether the obligation to
> repay such amounts may become otherwise unenforceable.

*Id*. at  para. 4.

On November 26, 2007, the debtors obtained a second loan from Peoples.[1]  This loan was

in the principal amount of $400,000.00 and was evidenced by Promissory Note #03553 (Peoples'

Loan 2).  Peoples' Loan 2 was secured by a real estate mortgage dated November 26, 2007 and

recorded December 14, 2007.  Exhibit A, which was appended to the mortgage, referenced eight

(8) separate parcels of real estate that were subject to the mortgage.  (Joint Stipulation, Exhibit

---

[1]According to the Stipulation of Facts, the debtors obtained other loans from Peoples
National Bank between November 2004 and November 2007.  These loans, however, are not
relevant to this inquiry.

11).  Exhibit A did not, however, list any of the lots in Windsor Place.

On or about August 20, 2008, the debtors solicited a loan from Banterra Bank (Banterra) in order to build a speculation or "spec" house on one of the Windsor Place lots.  In conjunction with this loan request, the debtors provided Banterra with a financial statement dated March 5, 2008.  In this statement, the debtors certified to Banterra that the information provided therein was complete and accurate. (Joint Stipulation, Exhibit 16).  Despite making this certification, the debtors' statement failed to disclose Peoples' Loan 2 in the amount of $400,000.00.  The debtors did, however, list Peoples' Loan 1, which was secured by a first mortgage on the Windsor Place lots.   In addition, the commitment for title insurance obtained by Banterra in conjunction with its loan noted as a special exemption the "[m]ortgage dated November 1, 2004. . .  executed by Cort and Lisa Jones and given to Peoples National Bank to secure a note in the amount of $214,044.25 and such other sums as provided therein."  (Joint Stipulation, Exhibit 18).[2]

Relying on this commitment and the information provided by the debtors, Banterra loaned the debtors $296,00.00 (Banterra Loan).  The Banterra Loan was secured by a construction mortgage dated August 28, 2008 and recorded September 3, 2008. (Joint Stipulation, Exhibit 20). The Banterra Loan was subsequently refinanced on December 31, 2009, evidenced by a new note in favor of Banterra in the amount of $295,956.84, and secured by a mortgage that was recorded on January 5, 2010 (Joint Stipulation, Exhibits 25-26).  It is undisputed that the debtors used the proceeds of the Banterra Loan to construct a spec home at 10 Windsor Place (Windsor Place subdivision Lot 5) and, after construction was completed,

---

[2]At the time that it extended the loan, Banterra intended to obtain a partial release of the mortgage securing Peoples Loan 1 that covered the spec home lot.  That release, however, was ultimately not obtained.

-3-

resided in the home as their principal residence.

On December 21, 2010, the debtors filed a voluntary Chapter 11 petition. Peoples and Banterra filed wholly secured proofs of claim as to their respective obligations.[3]  Debtors subsequently obtained permission from this Court to sell the 10 Windsor Place property and, on May 31, 2011, the property was sold to Andrew Johnson and Christine Thompson for $388,500.00. There is no dispute between the parties that Peoples, by virtue of it 2004 mortgage on the Windsor Place lots, is entitled to be paid the balance of Loan 1.  Peoples then asserts that pursuant to the cross-collateralization clause contained in the 2004 mortgage, it is also entitled to at least partial payment of Peoples' Loan 2.  Conversely, Banterra argues that the cross-collateralization clause is inapplicable in this case.  Banterra maintains that because it did not have actual knowledge of Peoples' Loan 2, it is a subsequent purchaser without notice and, therefore, entitled to the remaining proceeds after payments of Peoples' first mortgage.  Peoples filed a complaint requesting that the Court determine the priority of the parties' liens and both Peoples and Banterra  have filed motions for summary judgment on that complaint.[4]

## DISCUSSION

The broad type of cross-collateralization clause employed by Peoples in its 2004 mortgage is commonly referred to as a "dragnet clause" or "anaconda mortgage."  *National*

---

[3]Peoples filed wholly secured claims in the amount of $105,583.96 (Loan 1--Claim #14) and $445,929.19 (Loan 2--Claim #15) respectively.  Banterra filed a secured claim in the amount of $299,150.55 (Claim #22).  Both creditors maintain that their obligations are secured either in whole or in part by the Windsor Place property.

[4]Because of the dispute over how the sales proceeds should be distributed, the net sales proceeds of $353,263.79 have been placed in escrow pending the ruling of this Court.

*Acceptance Co. v. Exchange National Bank*,  Ill. App. 2d 396, 404, 243 N.E.2d 264 (1st Dist.

1968).   These mortgage provisions "attempt[] to make the mortgaged real estate security for

other, usually unspecified debts that the mortgagor may already or in the future owe to the

mortgagee." BLACK'S LAW DICTIONARY 494 (6th ed. 1990).   Due to their all-encompassing

nature, such clauses are prone to abuse and, consequently,  some courts have attempted to restrict

their applicability by requiring that "the future advances, [in order] to be covered, must 'be of the

same class as the primary obligation . . .  and so related to it that the consent of the debtor to its

inclusion may be inferred.'" *In re Swanson*, 104 B.R. 1, 4 (Bankr. C.D. Ill. 1989) (*quoting* 1

*Gilmore, Security Interests in Personal Property*, § 35.5 (1965)).   However, while some

jurisdictions have imposed these tests of "similarity" and "relatedness," Illinois has not.  Despite

the fact that dragnet clauses are disfavored under Illinois law, they "will be enforced where they

are clear and unambiguous."  *Swanson*, 104 B.R. at 3; *Stannish v. Community Bank of*

*Homewood-Flossmor*, 24 B.R. 761, 763 (Bankr. N.D. Ill. 1982).

In *Stannish,* the bankruptcy court addressed the enforcement of dragnet clauses in

Illinois.  The facts of that case are similar to those of the case at bar.  Between May 1976 and

August 1980, the debtors executed three separate debt instruments in favor of Community Bank

of Homewood-Flossmoor (Bank).  The first created a line of credit which could be drawn upon

by the debtors and which covered checking account overdrafts.  The second was a note secured

by a purchase money security interest in the debtors' 1980 Pontiac Phoenix.  The security

agreement accompanying the second note provided that the vehicle secured not only the

purchase money note, but, also, "all other past, present and future, direct or contingent liabilities

of debtor(s) to [the Bank]."  It also stated that the Bank would have the "right of set-off against

any deposits and other sums which may now or in the future be owing by the [Bank] to the

debtors." *Id.*, 24 B.R. at 762.  The third loan was an installment note dated August 9, 1980 in the

amount of $1,000.00.

On November 24, 1980, the debtors obtained a loan from General Finance Corporation

which was also secured by the 1980 Phoenix.  Debtors subsequently filed for bankruptcy

protection and the court was required to determine whether the Bank was entitled to use the

value of the vehicle in excess of the amount owed on the purchase money loan to setoff the

unpaid balances on other obligations owed by the debtors.   In finding in the Bank's favor, the

court determined that the language of the note was clear and unambiguous and sufficient to put a

subsequent creditor on notice of the Bank's position.   Specifically, the court stated:

> The language of the agreement clearly states that '[t]he holder shall have the right
> of set-off against any deposits and other sums which may now or in the future be
> owing by the Holder to the Debtor(s)'; and in the explanatory portion of the
> agreement, that '[T]his Security Agreement will secure future or other
> indebtedness.' *General Finance Corporation, the subsequent creditor, clearly*
> *was or should have been on notice of the Bank's position when it read the note*
> *and security agreement which listed the 1980 Pontiac Phoenix as collateral.  As a*
> *result, General Finance Corporation's position is junior to the bank's in all*
> *respects.  General Finance should have realized that it did not have a reasonable*
> *chance of recovering on its loan to the debtors.  The language of the agreement*
> *made it clear that Community Bank could use the automobile as security for any*
> *past or future advances it made to the debtor.*

*Id*. at 763 (emphasis added).

The cross-collateralization clause in the instant case is substantially similar to the

provision in *Stannish*.  The mortgage expressly states that, in addition to the subject note, the

mortgage secures all other existing and future obligations owing by the debtors to Peoples.

Despite this, Banterra maintains that the 2004 cross-collateralization clause is unenforceable for

several reasons.  Specifically, Banterra argues: (1)  that because the mortgage and note securing

Peoples' Loan 2 did not specifically reference the Windsor Place properties, there was no intent

between the debtors and Peoples to secure Peoples' Loan 2 with these lots; (2) that the cross-

collateralization clause in the 2004 mortgage was insufficient to create a valid mortgage under

Illinois law; and (3) that the cross-collateralization claim should be denied for public policy

reasons.  The Court shall address each of these arguments in turn.

It is well established that "intent of the partes plays a special role with respect to the

interpretation of dragnet clauses.  Court have stated that future advance clauses cover only

advances shown to have been within the contemplation of the parties at the time that the security

agreement was executed." *Swanson*, 1 B.R. at 3.   Banterra argues that because the mortgage

accompanying Peoples' Loan 2 did not specifically reference the Windsor Place properties, there

was no intent to include these properties as collateral for the loan.  Banterra further argues that

the failure to list the Windsor Place properties creates an ambiguity that must be resolved against

Peoples.  The Court disagrees.

In *Universal Guaranty Life Insurance Co. v. Coughlin*, 481 F.3d (7th Cir. 2007), the

Seventh Circuit Court of Appeals addressed the issue of whether a dragnet clause was negated

by a subsequent loan agreement between the same parties that did not refer to the earlier security

agreement.  In upholding the dragnet provision, the Court reasoned that "the purpose of a

dragnet clause is to protect a creditor against the possibility that it might forget to execute a

security agreement.  Therefore, it makes little sense to penalize a party that negotiated a dragnet

clause when that party fails to mention the security interest in a subsequent loan agreement." *Id.*

at 464, *citing In re Kazmierczak*, 24 F.3d 1020, 1021 (7th Cir. 1994) (a dragnet clause "saves the

parties the trouble of executing a new security agreement every time there is a further extension

-7-

of credit"). In reaching this conclusion, the *Coughlin* Court found it significant that there was no affirmative statement by the parties that the second loan was not secured by the prior collateral. As the Court explained:

> There is nothing ambiguous or contradictory about two documents, one that secures a loan with collateral A and another that secures the same loan with collateral B. Many loans are secured by multiple forms of collateral. On the other hand, where. . . a loan agreement affirmatively states that a loan is secured by collateral A and not secured by collateral A, it makes sense to find the agreement ambiguous.

*Coughlin*, 481 B.R. at 464.

Here, there is no question that the mortgage securing Peoples' Loan 2 did not reference the Windsor Place lots as collateral. However, based on the reasoning of *Coughlin*, this Court does not find People's failure to list the lots as collateral in the second mortgage indicative of the parties' intent, nor does the Court believe that it renders the document ambiguous. While Peoples certainly *could* have added the legal descriptions for the Windsor Place lots to the mortgage for Loan 2, it was not necessary for it to do so in light of its dragnet clause. To hold otherwise would, effectively, render the dragnet clause meaningless. Further, there was no affirmative statement in Peoples' second mortgage indicating that the cross-collateralization clause was inapplicable. Therefore, the Court concludes that Peoples' loan documents are not ambiguous and that the parties intended that the Windsor Place properties secure not only Peoples' Loan 1 but subsequent obligations owing to Peoples as well.

Banterra's second argument is that the cross-collateralization clause is insufficient to create a valid mortgage under Illinois law. Specifically, Banterra argues that "the open-ended nature of the cross-collateralization clause renders the mortgage ineffective and not record notice as to any claim that the mortgage secured the $400,000.00 balance on Note 0553 or any other

note of Debtors to Peoples."  Memorandum and Argument in Support of Banterra Bank's Motion

fo Summary Judgment at 10.[5]

In Illinois, the two essential elements of a mortgage are "a debt, legal liability, or

obligation to be secured and a conveyance with an intention to secure that debt or obligation."

*In re Pak Builders*, 284 B.R. 650, 663 (Bankr. C.D. Ill. 2002) (*quoting Caraway v. Sly*, 222 Ill.

203, 78 N.E. 588, 589 (1906)).  In addition, § 11 of the Conveyances Act sets forth the statutory

form for mortgages in Illinois.  It states as follows:

§ 11 Mortgages of lands ***may*** be in substantially the following form:

The mortgagor (here insert name or names), mortgages and
warrants to (here insert name or names of mortgagee or
mortgagees), to secure the payment of (here recite the nature and
amount of indebtedness, showing when due and the rate of interest,
and whether secured by note or otherwise), the following described
real estate (here insert description thereof), situated in the County
of . . ., in the State of Illinois.

Dated (insert date).

(signature of mortgagor or mortgagors)

765 ILCS 5/11 (2011) (emphasis added). "A mortgage that strictly complies with § 11's outline

for form and content and is 'deemed' to be sufficient and valid as against the mortgagor and,

once recorded, as to third parties for constructive notice purposes.[6]  A mortgagee who deviates

---

[5]In its brief, Banterra argues that the 2004 mortgage is "defective" even as to the balance
owed to Peoples' Loan 1.  However, Banterra concedes that Peoples' 2004 mortgage on the
Windsor Place lots has priority over its mortgage because Banterra had actual knowledge of that
debt and mortgage.  Memorandum and Argument in Support of Banterra Bank's Motion for
Summary Judgment at 8.

[6]"Constructive notice" is "notice that is deemed to be provided by an instrument of
conveyance that is both sufficient in substance and properly recorded in the county in which the
subject real estate is located." *Sharma Manning Properties*, 2010 WL 4290667 at *5.

from § 11 risks losing that 'deemed' or automatic protection from challenges to the efficacy of

its mortgage." *In re Shara Manning Properties, Inc*, 2010 WL 4290667 at *9 (Bankr. C.D. Ill.

2010).[7]

Banterra asserts that it is "impossible" to determine from the language of Peoples' 2004

mortgage the amount of the secured debt, the maturity date, or interest rate, and, therefore the

instrument is "ineffective" and "not record notice as to any claim that the mortgage secured the

$400,000.00 balance on Note 03553." Memorandum and Argument in Support of Banterra

Bank's Motion for Summary Judgment at 9-10.). In support of this position, Banterra relies on

*Bullock v. Battenhousen*, 108 Ill. 28, 1883 WL 10352 (Ill. 1883), in which the Illinois Supreme

Court held that

> [t]he policy, though not the letter, of our statutes requires, in all cases, a
> statement upon the record of the amount secured. . . . A statement upon the
> record of the amount claimed to be due informs all what lien is claimed. They
> know what they must contest, or subject to what they must take, in subsequently
> dealing with the property. It prevents secret conspiracies between mortgagors and
> mortgagees as to the fact and amount of indebtedness to the to the detriment of
> subsequent purchasers and creditors. . . .

*Bullock*, 1883 WL at *5. *See also Metropolitan Bank v. Godfrey*, 23 Ill. 579, 1860 WL 6314 (Ill.

1860) ("[t]he spirit of our recording system requires that the record of a mortgage should

disclose, with as much certainty as the nature of the case will admit, the state of the

incumbrance. If a mortgage is given to secure an ascertained debt, the amount of the debt should

be given."); *In re Shara Manning Properties, Inc.*, 2010 WL 4290667 at *4 (Bankr. C.D.

Illinois) ("[t]he year before Abraham Lincoln's first inauguration, the Illinois Supreme Court

---

[7]Throughout his brief, counsel for Banterra repeatedly cites this section as 765 ILCS *5/5*.
**There is no § 5/5 of the Illinois Conveyance Act.** The Court assumes that counsel intended to
refer to § 5/11.

announced the rule that if a mortgage is given to secure an ascertained debt, the amount of the debt should be stated in the mortgage."). However, Banterra's reliance on *Bullock* and its progeny is misplaced. *Bullock* involved a  mortgage that failed to state the amount of the indebtedness to be secured. That is not the case here. Peoples' 2004 mortgage contained a maximum lien clause which expressly provided that "at no time shall the principal amounts of [i]ndebtedness secured by the [m]ortgage. . .  exceed $214,044.26." (Joint Stipulation, Exhibit #3).

Further, the case at bar is distinguishable from *Northridge Bank v. Lakeshore Commercial Finance Corporation*, 48 Ill. App. 3d 82, 365 N.E.2d 382, 8 Ill. Dec. 144 (1st Dist. 1977), which was cited by Banterra in its brief. In *Northridge*, the mortgagor executed an initial mortgage in favor of Lakeshore Commercial Finance Corporation. The mortgage indicated that it was to secure the principal sum of $30,000.00. Said mortgage also provided that the subject property would serve as security for any subsequent or other obligations due by the mortgagor to Lakeshore. The mortgage did not include a "maximum lien" clause. Two weeks later, the mortgagor executed a mortgage of the same property to Northridge Bank. The Northridge mortgage did not state the amount of the indebtedness that it secured.

Northridge recorded its mortgage at 9:28 a.m. on October 25, 1974. On that same day, at 3:07 p.m., the prior mortgage in favor of Lakeshore was recorded. A dispute subsequently arose between the creditors as to which held the superior lien. Northridge conceded that its mortgage was ineffective to impart constructive notice due to the fact that it failed to state the amount of the indebtedness. The court determined that Lakeshore's mortgage suffered from the same defect because it "allow[ed] Lakeshore to make an unlimited amount of future advances under

-11-

the same instrument, and language which would have set a ceiling on the amount of any future

advances ha[d] been deleted." *Id,* 386 N.E.2d at 386.  As between the two defective mortgages,

the Court determined that Northridge's mortgage took priority because it was recorded first.

Unlike the "open-ended" mortgage in *Northridge*, the mortgage in the instant case stated

the amount of the obligation secured by the mortgage. It is clear from the language of the

instrument that the maximum amount of indebtedness secured by the mortgage-- whether on

Peoples' Loan 1 *or subsequent obligations owing from the debtor under the cross-*

*collateralization clause*– was $214,044.26.

In addition, a careful reading of the language of § 5/11 reveals that it its provisions are

permissive, not mandatory.  The first clause of § 5/11 states that mortgages of land *"may* be in

*substantiall*y the following form" (emphasis added).  While certainly courts have interpreted the

statute to require that the mortgage state the amount of indebtedness, there is no indication that

the failure to include other elements of § 5/11 is necessarily fatal to the mortgagee.  The primary

consideration under § 5/11 appears to be whether the mortgage instrument is sufficient to put a

third party on notice of the mortgage debt. As the Court noted in *In re Berg*, 387 B.R. 524, 560

(Bankr. N.D. Ill. 2008):

> [S]ome opinions of Illinois courts post-*Bullock* have recognized some flexibility
> in reading the statutory requirements for an Illinois mortgage.  For example, it has
> been held that specifying the amount of indebtedness in the mortgage was
> unnecessary where the mortgage listed the interest rate, periodic interest
> payments and date of maturity so that one could calculate the principal amount;
> *where the mortgage secured future advances not to exceed the amount of*
> *indebtedness listed on the mortgage*, *Skach v. Gee* 137 Ill. App. 3d 216, 91 Ill.
> Dec. 882, 484 N.E.2d 441, 443 (1st Dist. 1985); and where the mortgage and note
> secured by it mutually refer to one another, *Bailey*, 999 F.2d at 242.  *In other*
> *words, in those cases the amount of mortgage lien was evident or calculable even*
> *though not specified, so third parties reading the recorded instrument were on*

> *notice of the mortgage debt.*

*Berg*, 387 B.R. at 560-61 (emphasis added).

The mortgage in question disclosed the maximum amount of Peoples' lien.  In addition, the cross-collateralization clause was conspicuously placed on the first page of the mortgage. Therefore, it is at least arguable that the instrument was sufficient to provide Banterra with constructive notice of the cross-collateralized debt, even though the document itself did not set forth a specific interest rate or the maturity date.[8]  However, the Court need not consider whether the mortgage in question was sufficient under § 5/11 to provide Banterra with constructive notice because Banterra admittedly had ***actual*** notice of the 2004 mortgage and its contents– including the cross-collateralization clause.  Banterra maintains that it is a subsequent purchaser without notice because it did not have "actual notice or knowledge" of Peoples' Loan 2.  This, however, is not the relevant inquiry.  The question is not whether Banterra had knowledge of Peoples' subsequent loan, but, rather, whether it had notice of the cross-collateralization clause and was apprised of facts or circumstances from which other liens against the property could have been discovered.

In *Shara Manning Properties, Inc.*, 2010 WL 4290667 (Bankr. C.D. Ill 2010), the court discussed the various types of notice and their effect.  As it explained:

> [A]ctual knowledge of a prior mortgage interest prevents a subsequent mortgagee from taking free and clear of the prior mortgage, regardless of whether or not the subsequent mortgagee may be deemed to be on constructive notice by virtue of its recording.  Proof of actual knowledge makes the constructive notice inquiry unnecessary.  Simply put, a transferee has actual knowledge of a prior interest

---

[8]The mortgage provided for a variable interest rate.  The maturity date was not specified.

when he is aware of its existence.  Inquiry notice is a different point on the same continuum.  *Inquiry notice describes the situation where the transferee has been made aware of facts or circumstances from which the existence or possibility of a prior claim might reasonably be inferred.  If so, the purchaser then has a duty to verify or dispel the inference through further inquiry.  If he fails to make inquiry, he is nonetheless chargeable with knowledge of facts that a diligent inquiry would have disclosed, the same as if he had acquired actual knowledge of those facts.*  A transferee gains no cover by adopting a devil may care attitude.  He must act with caution and prudence such that every unusual circumstance is a ground of suspicion that demands investigation.

*Id. at *5* (citations omitted) (emphasis added).  The parties did not cite, nor was the Court able to find any authority from Illinois on the issue of whether actual notice of a cross-collateralization clause in a mortgage imparts inquiry notice as to the existence of other obligations that may be covered by the security instrument.  However, other jurisdictions that have addressed this issue have determined that notice of an instrument containing a cross-collateralization provision constitutes notice as to obligations covered by that provision as well.

In *New Mexico Bank and Trust Co. v. Lucas Brothers*, 92 N.M. 2, 582 P.2d 379 (N.M. 1978), debtor Lucas Brothers Partnership executed several notes in favor of New Mexico Bank and Trust Co (New Mexico).  The mortgages securing two of these notes contained "dragnet" clauses which stated that the subject real estate would also secure subsequent obligations owed by the debtors to New Mexico up to $20,000.00.  The debtors then obtained a loan from Liberty Bank and granted it a mortgage in the same real estate that was subject to the New Mexico mortgages.  In a subsequent priority dispute between the two banks, the New Mexico Supreme Court concluded that because New Mexico's mortgage stated the mortgage amount on its face and because "Liberty had notice of that mortgage and of the 'dragnet clause,'" New Mexico's lien was entitled to first priority to the extent of the stated amount of its mortgage.  *Id*, 582 P.2d

at 382.  *See also Merchants State Bank v. First Tennessee Bank*, 1993 WL 424817 (Tenn. App.

1993) (mortgage containing cross-collateralization clause given first priority where loan officer

of subsequent lender had actual knowledge of its existence); *La Cholla Group, Inc. v. Timm*, 173

Ariz. 490, 492, 844 P.2d 657, 659 (Ariz. App. Div. 2 (1992) (dragnet clauses are good "as

against all subsequent encumbrancers and purchasers having notice of the mortgage").   Here,

Banterra  acknowledges that it had actual notice of the first mortgage in favor of Peoples.  The

cross-collateralization clause was conspicuously placed on the first page of that mortgage and

even a cursory review of the document could have revealed its existence.  Hence,  Banterra is

charged with inquiry notice that other loans secured by the real estate may have existed.[9]

     Finally, Banterra requests that the Court reject enforcement of Peoples' cross-

collateralization clause for public policy reasons.  Specifically, Banterra argues that "it would be

unreasonable to require second mortgage creditors to go beyond the public record and make

private inquiries as to all other debts not described but potentially secured by such a mortgage."

Memorandum and Argument in Support of Banterra Bank's Motion for Summary Judgment at

13.  Banterra maintains that enforcement of Peoples' cross-collateralization provision "will have

a chilling effect on lending and commerce, forcing lenders to inquire far beyond the face of a

mortgage to determine which note or debt is secured by a given mortgage." *Id*.  The Court

disagrees.

---

[9]This is particularly true in light of the nature of Banterra's loan to the debtors. The
debtors sought funding from Banterra for commercial real estate purposes.  The loan report
prepared by Banterra indicates that in addition to owning the Windsor Place subdivision, the
debtors were in the rental real estate business and owned 63 mobile homes.  Given the nature and
size of the debtors' business, it would reasonable to expect that the debtors may have other loans
and that those loans could be secured by the subject real estate.

In the instant case, Banterra acknowledges that its decision to grant the debtors a loan was premised on records that did not disclose the outstanding $400,000.00 debt to Peoples. Memorandum and Argument in Support of Banterra Bank's Motion for Summary Judgment at 12, *citing* Joint Stipulation, Exhibit 17.  However, as Peoples points out in its brief, this obligation– as well as others owed by the debtors to Peoples-- could easily have been discovered through a review of the debtors' credit report or a name search of the Jefferson County land records.  Peoples' Motion for Summary Judgment at 24, 27.  It has long been held that "if facts appear[] in the chain of title which would cause an ordinarily prudent man to investigate, he cannot close his eyes and refuse to go further [in his investigation]." *Polish National Alliance of U.S. of North America v. Lipinski*, 288 Ill. App. 234, 245, 6 N.E.2d 320, 325 (1st Dist. 1937). Therefore, the Court concludes that upon being apprised that Peoples' mortgage on the Windsor Place lots contained a cross-collateralization clause, it was incumbent upon Banterra to diligently investigate whether the debtors had other obligations that may be affected by the provision.  To hold otherwise would render cross-collateralization clauses ineffective as to subsequent mortgagees in virtually every circumstance, and would, effectively, allow subsequent mortgagees to simply ignore cross-collateralization clauses without peril.

Based on the foregoing, the Court determines pursuant to Federal Rule of Civil Procedure 56, made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7056, that there are no genuine issues as to any material fact and that Peoples is entitled to judgment as a matter of law.  Accordingly, Peoples National Bank's Motion for Summary Judgment is GRANTED and Banterra Bank's motion is DENIED.   Peoples, by virtue of its 2004 mortgage and attendant cross-collateralization clause, is entitled to recover $214,044.26, plus per diem  interest, legal

16

fees, and costs from the proceeds of the sale of the property at 10 Windsor Place, Mount Vernon, Illinois.[10]  The remaining proceeds shall be paid to Banterra Bank to satisfy its mortgage of December 31, 2009 on the Windsor Place property.

A separate judgment shall enter.

ENTERED: December 9, 2011


_____/s/ Kenneth J. Meyers_____
UNITED STATES BANKRUPTCY JUDGE

---

[10]While it is not clear, Peoples appears to assert in its prayer for relief that it is somehow entitled to more than $214,044.26.  In subparagraph C of its prayer, Peoples requests that the Court "direct that any proceeds remaining after the satisfaction of Peoples National Bank N.A.'s $214,044.26 [sic], plus attorneys' fees and costs, plus amounts which the Court determines Banterra Bank possessed actual or inquiry notice of, then be used to satisfy Banterra's mortgage dated December 31, 2009. . . ."  As indicated in the opinion, Peoples' 2004 mortgage contained a maximum lien clause which "capped" the indebtedness secured by the instrument at $214,044.26. Therefore, Peoples is only entitled to a secured claim to that extent, plus interest, attorneys' fees, and costs.